| | |
|---|---|
| **ERIC KIRMER** | **CIVIL ACTION** |
| **VERSUS** | **NO: 11-069** |
| **GOODYEAR TIRE & RUBBER CO.** | **SECTION "C"(2)** |

## ORDER & REASONS

Before the Court are five Motions: (1) Motion for Summary Judgment by Defendant Goodyear Tire & Rubber Co. ("Goodyear"); (2) Motion for Partial Summary Judgment by Plaintiff Eric Kirmer ("Plaintiff"); (3) Motion to Unseal Documents filed by Plaintiff; (4) Motion to Strike by Goodyear; and (5) Motion *In Limine* to Exclude the Expert Report and Trial Testimony of Courtland M. Chaney. (Rec. Docs. 62, 65, 56, 73, 61). Based on the memoranda of counsel, the record, and the law, the Court PARTIALLY GRANTS AND PARTIALLY DENIES Goodyear's Motion for Summary Judgment; PARTIALLY GRANTS AND PARTIALLY DENIES Plaintiff's Motion for Partial Summary Judgment; DENIES Plaintiff's Motion to Unseal; DENIES Goodyear's Motion to Strike; and DENIES AS MOOT Goodyear's Motion *In Limine* for the following reasons.

## I. BACKGROUND

Plaintiff was an "at-will" service manager at three Goodyear stores from 2008 to 2010. (Rec. Doc. 10 at ¶¶ 6-7; Rec. Doc. 62-2 at 39). Specifically, he worked at the Goodyear store in Lakeside

Mall ("Lakeside store") from August 2008 to January 13, 2010. (Rec. Doc. 62-2 at 11). He was then transferred to the Gentilly branch ("Gentilly store"), and then transferred for the second and final time to the Airline branch ("Airline store"). (Rec. Doc. 62-2 at 14). Plaintiff alleges that he was discriminated against, and wrongfully transferred and terminated, under various federal and state employment discrimination laws.

Plaintiff, who was born in New Mexico and is a United States citizen, has a Panamanian father, and considers himself half white, half Hispanic, alleges that he was subjected to racist or ethnic insults twice at the Lakeside store. (Rec. Doc. 62-2 at 6, 17-19). First, in December 2009, Livingston Muelhousen, another employee, allegedly asked Plaintiff how "wetbacks" celebrated Christmas. (Rec. Doc. 62-2 at 17-18). Second, sometime before being transferred to the Gentilly store, Don Johnson, Plaintiff's coworker, asked him how he got across the border. (Rec. Doc. 62-2 at 18-19). Plaintiff points to no other instances of discrimination. He was fired ten months later at a different Goodyear branch.

While at the Lakeside store, Plaintiff alleges that he witnessed two Goodyear employees charging customers for coolant flushes when they were actually performing an equivalent, but less expensive, procedure called "drain and fills." (Rec. Doc. 62-2 at 15-16). He reported this to District Manager David Guttuso in early January, after which the concerned employees were written up for not using the flush machine. (Rec. Doc. 70-2 at 108-109). Guttuso claims that the two concerned employees later explained that they were not using the machine because it was not functioning properly. (Rec. Doc. 62-3 at 21). Plaintiff also alleges that he reported to Guttuso that mechanics at the Lakeside location were improperly disposing of engine oil. (Rec. Doc. 70-2 at 13). In April 2010, after he had been transferred from the Lakeside store to the Gentilly store, Plaintiff called Goodyear's hotline complaining about the alleged overbilling he had witnessed at the Lakeside

store, as well as the racial and national origin discrimination he had experienced there. (Rec. Doc. 62-2 at 15-16).

Plaintiff injured his back while working at the Airline store on June 16, 2010. (Rec. Doc. 62-2 at 22-23). He then filed a claim for workers' compensation. (Rec. Doc. 62-2 at 24). Plaintiff's doctor recommended that he return to work with restrictions to accommodate his injury on June 30, 2010, which he did. (Rec. Doc. 62-2 at 25, 43). Plaintiff had weekly doctor's appointment related to his injury in July. (Rec. Doc. 62-2 at 28). On one occasion, as he was arriving to his appointment, his supervisor Riccardi called to inform him that he had to return to the store because it was busy, so Plaintiff did, but Plaintiff claims that the store was in fact not busy at the time. (Rec. Doc. 62-2 at 28-29). As a result, Plaintiff rescheduled that appointment but he did not testify that he had any difficulty in doing so. (Rec. Doc. 62-2 at 29).

Plaintiff claims that Riccardi would "kind of smirk or laugh" when he saw the restrictions on Plaintiff's activity and that he told Plaintiff that he had to "do his job," but Plaintiff admits that he did not ask Riccardi or anyone else to help him. (Rec. Doc. 62-2 at 27). Plaintiff also claims that he was perceived as disabled in that employees at Goodyear, including Riccardi, "would give me slack about not being able to do certain things, and every time [Riccardi] would laugh and say, 'You have got a job to do, you know, you have got to do it, you know.'" (Rec. Doc. 62-2 at 33). Plaintiff also alleges that "if somebody dropped a set of keys or something like that, [Riccardi] would say, 'Oh, don't pick that up, you're going to hurt yourself again.'" (Rec. Doc. 70-2 at 49).

Plaintiff alleges that he was transferred in retaliation for complaining about race and national origin discrimination, for filing a workers' compensation claim, and for complaining about the alleged fraud at the Lakeside location. He alleges that the first transfer was retaliatory because he made less in bonuses at the Gentilly store than at the Lakeside store. (Rec. Doc. 70-2 at 17).

Plaintiff acknowledges that the made more in bonuses at the Airline store than at the Gentilly store, and also that his salary did not change with each transfer. (Rec. Doc. 70-2 at 18, 20). Bonuses for employees like Plaintiff are calculated based on the number of tires they sell. (Rec. Doc. 70-3 at 116). The Gentilly store "sometimes" sells less tires than the Lakeside store because it is a smaller store. (Rec. Doc. 70-3 at 117). However, the number of tires sold is not predictable. For instance, in February 2011, the Gentilly store was selling more tires than the Lakeside mall. (Rec. Doc. 70-3 at 117). According to Plaintiff, the Airline store was undesirable because, although it was a larger volume store, it was "known as the drama queen store." (Rec. Doc. 62-2 at 14).

He also alleges that he was terminated in retaliation for his various complaints. However, Goodyear maintains that Plaintiff was fired because several employees reported that they witnessed Plaintiff sleeping while on duty twice. (Rec. Doc. 62-3 at 7, 11-14). First, Beau Richards claimed that he saw Plaintiff sleeping in the store manager's office on August 30, 2010, "around 4pm," and that Kirk Lee woke him up fifteen minutes later and asked him how he was doing, to which Plaintiff responded that "he was ok just tired." (Rec. Doc. 62-3 at 10, 12). Lee also claimed to have seen Plaintiff sleeping that day at the same time. (Rec. Doc. 62-3 at 12, 14). Plaintiff denies that he was sleeping that day. (Rec. Doc. 70-2 at 44). Second, Wayne Jackson and Kirk Lee each filed statements saying they had seen Plaintiff sleeping in the store manager's office on September 6, 2010, "around 3:30 pm" between twenty and thirty minutes. (Rec. Doc. 62-3 at 11, 13). Plaintiff admits that on September 6, he was sleeping at the store while the store was open. (Rec. Doc. 62-2 at 20). However, he claims that he had clocked out before he started sleeping, and that he had a fever at the time. (Rec. Doc. 62-2 at 20). Plaintiff's time sheet indicates that on that day, he clocked out at 4:11 p.m. (Rec. Doc. 70-3 at 87).

Sleeping on duty is grounds for immediate termination according to Goodyear policy. (Rec.

Doc. 62-3 at 24).  Patricia Cronin, the Human Resources representative who approved Plaintiff's termination, claims that she had no prior knowledge of Plaintiff's complaints of racial and national origin discrimination, and that she approved his termination solely because of the two sleeping incidents and accompanying witness statements.  (Rec. Doc. 62-3 at 6).  An employee like Plaintiff cannot be terminated without Cronin's approval.  (Rec. Doc. 62-3 at 9).  Riccardi, Plaintiff's supervisor, who ultimately terminated Plaintiff, testified in his depositions that he had no prior knowledge of Plaintiff's complaints of alleged overbilling practices that took place at the Lakeside store.  (Rec. Doc. 62-3 at 31).

Plaintiff was suspended from work on September 10, 2010 pending a performance review. According to Cronin, his termination was effective on September 10, 2010.  (Rec. Doc. 62-3 at 26). Plaintiff alleges that he was notified on September 14, 2010 that he had been terminated.  (Rec. Doc. 70 at 2).  Plaintiff clocked in at work on September 10, 2010, but his supervisor, Rich Riccardi, told him about the review and to return home.  (Rec. Doc. 62-2 at 30).  Plaintiff admits that he did not work on any day from September 10, 2010 through September 14, 2010.  (Rec. Doc. 62-2 at 30).

Plaintiff was paid on a bimonthly basis, on the first and fifteenth of every month.  Plaintiff admits that he was paid, via direct deposit, on September 15, 2010.  (Rec. Doc. 70-2 at 50-51). Cronin stated in her Declaration that his September 1 through September 15 paycheck was amounted to $1,176.96, but that his paycheck was reduced by $313.25 to $836.71 since he did not work from September 10 through September 14, and since his termination was effective on September 10. (Rec. Doc. 62-3 at 26).    At the time Plaintiff was terminated, Goodyear's practice was not to deposit bonus checks directly into employees' accounts; instead, employees picked their checks up at the store where they worked.  (Rec. Doc. 62-3 at 27).    Plaintiff's August bonus check amounted to $615.69, but was reduced by $313.25 to account for the overpayment in Plaintiff's final paycheck,

and made available at the Airline store for pickup on September 20, 2010. (Rec. Doc. 62-3 at 26).

On September 30, 2010, Plaintiff contacted Goodyear through his lawyer, demanding payment of a bonus check which Plaintiff alleged amounted to $1,000. The letter, which is attached to Plaintiff's Motion for Partial Summary Judgment, also demanded wages for work through September 14, 2010, as well as a penalty of $105 per day up to 90 days following the date of the letter of demand. Finally, the letter demanded $320 in attorney's fees. (Rec. Doc. 65-4 at 1-2). The letter does not specifically demand vacation pay; nor does the Complaint or the Amended Complaint. Plaintiff's Motion for Partial Summary Judgment, filed March 12, 2012, specifically demanded accrued vacation pay and associated late penalties in addition to his demand for unpaid wages and bonus. (Rec. Doc. 65-1 at 2). In a March 22, 2012 letter, Goodyear informed Plaintiff that he was entitled to payment for 27 hours of unused vacation leave from the year 2009, amounting to $498.47. Goodyear also agreed to pay Plaintiff penalty wages amounting to $1,454.50 for the 10 day delay in payment between March 12, 2012, when Goodyear claims it learned of Plaintiff's claim for vacation pay, and March 22, 2012, when Goodyear agreed to pay for it. (Rec. Doc. 87-1). Plaintiff claims that he is owed penalty wages and attorney's fees for Goodyear's failure to timely pay his unused vacation time. (Rec. Doc. 83 at 3).

Plaintiff asserts nine causes of action against Defendant in this employment case. He claims that (1) Goodyear discriminated against him because of his race and/or his national origin, in violation of La. Rev. Stat. § 23:332, and 42 U.S.C. § 1981 (Rec. Doc. 10 at ¶¶ 37, 58-64); (2) Goodyear transferred and terminated him because of his race and/or national origin, in violation of La. Rev. Stat. § 23:332, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Rec. Doc. 10 at ¶¶ 37, 65-71); (3) Goodyear discriminated against and terminated him because of his disability or perceived disability, in violation of La. Rev. § 23:323, and the Americans with Disabilities Act

of 1995 ("ADA"), 42 U.S.C. § 12112 (Rec. Doc. 10 at ¶¶ 34-37; 47-57); (4) Goodyear failed to grant him leave and retaliated against him by terminating him for using his leave, in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, (Rec. Doc. 10 at ¶¶ 27-33); (5) Goodyear retaliated against him by terminating him for filing a workers' compensation claim, in violation of La. Rev. Stat. §§ 23:301 and 23:1361 (Rec. Doc. 10 at ¶¶ 39-40); (6) Goodyear retaliated against him by terminating him for opposing Goodyear's alleged discriminatory practices, in violation of La. Rev. Stat. §§ 23:301, *et seq.*, and 23:967 (Rec. Doc. 10 at ¶¶ 39, 42); (7) Goodyear retaliated against him by terminating him for opposing Goodyear's alleged theft and/or fraud, in violation of La. Rev. Stat. §§ 23:301, *et seq.*, and 23:967 (Rec. Doc. 10 at ¶¶ 39, 42); (8) Goodyear retaliated against him by terminating him for opposing Goodyear's alleged state environmental law violations, in violation of La. Rev. Stat. §§ 23:301 and 30:2027 (Rec. Doc. 10 at ¶¶ 39, 41); and (9) Goodyear failed to issue his final wages in violation of La. Rev. Stat. § 23:631. (Rec. Doc. 10 at ¶¶ 44-46).

## II. LAW & ANALYSIS

### A. Motion for Summary Judgment by Goodyear and Motion for Partial Summary Judgment by Plaintiff

Plaintiff's Motion for Partial Summary Judgment argues that Plaintiff is entitled as a matter of law to final wages as set forth in the Motion. Because Goodyear's Motion for Summary Judgment addresses this claim, in addition to all of Plaintiff's other claims, the Court will address both Motions together.

Summary judgment is proper only when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56. A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1996). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on unsubstantiated assertions and conclusory allegations. *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994).

### 1. Race and National Origin-Based Hostile Work Environment Claims

Plaintiff must show the following to establish a *prima facie* case of racial discrimination: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). The harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor*

*Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Courts determine whether an environment is hostile based on the totality of the circumstances, focusing on the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Here, Plaintiff alleges that in his two and a half years of employment at Goodyear, he was referred to as a "wetback" once and asked how he got across the border from Mexico to the United States once. The cases cited by Plaintiff do not support his contention that this behavior meets the standard for severity. *See, e.g., Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993); *Bailey v. Binyon*, 583 F. Supp. 923 (N.D. Ill. 1984); *Brown v. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 860 (5th Cir. 1993). Furthermore, Plaintiff does not dispute that a discrimination and harassment training session was held after Plaintiff reported "wetback" comment. (Rec. Doc. 70-2 at 25; Rec. Doc. 62-3 at 2). Thus, Goodyear took remedial action when appropriate. Courts routinely look to federal jurisprudence to interpret Louisiana employment discrimination statutes. *See Smith v. Amedisys Inc.*, 298 F.3d 434 (5th Cir. 2002). Plaintiff has not articulated a reason why this Court should not do so in this case, and the Court finds none. Goodyear is therefore entitled to judgment as a matter of law with respect to this claim under federal and state law. Furthermore, as Plaintiff did not allege that any derogatory remarks related to his national origin were made besides those two, his national origin-based hostile work environment claim under federal and state law is also dismissed.

**2. Race and National Origin-Based Transfer and Termination Claims**

As a preliminary matter, Plaintiff's race-based retaliation claim fails as a matter of law

because he failed to exhaust his administrative remedies. *See Kebiro v. Walmart*, 193 F. Appx. 365, 367 (5th Cir. 2006). He admits that he failed to check the "race" box in his Equal Employment Opportunity Commission ("EEOC") claim. (Rec. Doc. 62-2 at 31). Even if he had done so, Plaintiff has provided no evidence that he was transferred or terminated because of his race.

Further, Plaintiff admits he was not terminated because of his national origin, and maintains only that he was discriminated against in the form of an adverse employment action, namely, when he was transferred from the Lakeside store to the Gentilly store and when he was transferred from the Gentilly store to the Airline store. (Rec. Doc. 62-2 at 32).

The Fifth Circuit uses the same analysis for claims of intentional discrimination under 42 U.S.C. § 1981 and Title VII. *See Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). Where, as here, the plaintiff does not introduce direct evidence of discrimination, courts use a burden-shifting analysis to determine whether discrimination occurred. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To survive a motion for summary judgment on the ground that he was transferred because of his national origin, Plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination showing that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) he was replaced by someone outside the protected class. *Shackelford v. Deloitte & Touche, LLP*, 190 3d 398, 404 (5th Cir. 1999). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *See Shackelford*, 190 3d at 404. If the defendant satisfies this burden, the burden shifts back to the plaintiff to raise a genuine issue of material fact that the proffered reason was merely a pretext for a national origin-based reason for the action. *See Shackelford*, 190 3d at 404.

Here, Plaintiff presents no evidence addressing the fourth element, that is, that he was

replaced by someone who does not have national origin other than American. Accordingly, his state and federal claims for wrongful transfer and termination on the basis of his national origin and his race are dismissed.

### 3. Disability Discrimination Claim

With respect to his disability-based discrimination claim, the *McDonnell Douglas* analysis also applies. To establish a *prima facie* case of discrimination under the ADA, the plaintiff must show that (1) he suffers from a disability; (2) he is qualified for the job; (3) he was subject to an adverse employment action; and (4) he was replaced by a non-disabled person or was treated less favorably than a non-disabled employee. *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995). Courts analyze La. Rev. Stat. § 23:323 disability claims using the same framework as ADA claims. *See Alleman v. Louisiana Dept. of Econ. Dev.*, 698 F. Supp. 2d 644, 656 (M.D. La. 2010).

Here, Plaintiff presents no evidence addressing the fourth element, that is, that he was replaced by a non-disabled person or treated less favorably than a non-disabled employee. Accordingly, his state and federal claims for disability-based discrimination are dismissed.

### 4. Claim for Discrimination and Retaliation Under the Family Medical Leave Act

Plaintiff alleges that Goodyear violated the FMLA in that he was not permitted to take FMLA leave and that he was retaliated against when Goodyear terminated him for asserting his rights under the FMLA. To establish an FMLA interference claim, the plaintiff must show that (1) he is an eligible employee; (2) the defendant is an employer under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave notice to the defendant of his intention to take leave; and (5)

he was denied benefits to which he was entitled under the FMLA. *Anderson v. New Orleans Jazz & Heritage Festival*, 464 F. Supp. 2d 562, 567 (E.D. La. 2006) (Vance, J.).

Here, Plaintiff cannot meet the fifth element. After Plaintiff's June 16, 2010, injury, Plaintiff's doctor recommended that he return to work with restrictions to accommodate his injury on June 30, 2010, which he did without incident. (Rec. Doc. 62-2 at 25, 43). Plaintiff also scheduled weekly doctor's appointments related to his injury in July. (Rec. Doc. 62-2 at 28). With one specific exception, he was permitted to attend those appointments without incident. On one occasion, his supervisor Riccardi called him back to the store because the store was busy. Plaintiff canceled his appointment and returned to the store. (Rec. Doc. 62-2 at 28-29). Plaintiff claims that the store was not busy when he returned, but Plaintiff admits that he rescheduled that one appointment for another date without incident. These facts do not indicate that Plaintiff was denied the right to take leave. Accordingly, Plaintiff's FMLA interference claim is dismissed.

The *McDonnell Douglas* analysis also applies to FMLA retaliation claims. *See Chaffin v. John H. Carter Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999). To establish a FMLA retaliation claim, the plaintiff must show that (1) he was protected under the FMLA; (2) he suffered an adverse employment action; and (3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he sought protection under the FMLA. *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 580 (5th Cir. 2006).

Here, Plaintiff presents no evidence addressing the third element, that is, that he was treated less favorably than an employee who had not requested leave under the FMLA or that he was subjected to an adverse decision because he sought FMLA leave. Accordingly, his FMLA retaliation claim is dismissed.

**5. Claim for Retaliation for Filing a Workers' Compensation Claim**

A plaintiff has a claim under Louisiana law if he shows that he was denied employment or discharged because he asserted a claim for workers' compensation. La. Rev. Stat. § 1361A-B. In Louisiana, the plaintiff has the burden to show that he was terminated for asserting a workers' compensation claim. *Orr v. Bancroft Bag, Inc.*, 687 So. 2d 1068, 1070 (La. App. 2 Cir. 1997). If the employer provides another reason for terminating the employee, the court must determine whether that reason was pretextual. *Orr*, 687 So. 2d at 1070.

Here, as evidence that Plaintiff was retaliated against for filing a workers' compensation claim, Plaintiff points mainly to one instance where a member of Goodyear's Human Resources department, Emily Baranek, "targeted [Plaintiff] on that basis." (Rec. Doc. 91 at 6). In her deposition, Baranek testified that she visited the Airline store to inquire about Plaintiff's performance. (Rec. Doc. 70-3 at 40). She explained what she meant by two notations she took during or about that visit:

> Q. Okay. "In light of [Plaintiff's] associate relations and Workers' Comp. issues," what does that mean?
> A. That means – that's just acknowledging that he's had both complaints and a Workers' Comp since he's been employed with us.
> Q. He's had complaints?
> A. He had a complaint that he filed.
> Q. Okay. "[Riccardi] will need to call upon David and Trisha to assist with properly documenting his performance issues"?
> A. Correct.
> Q. What does that mean?
> A. That means that if his performance is still below expectations, which it had been prior to either of those issues, the complaint or the Workers' Comp., that [Riccadi] would need to make sure that he called upon help to distinguish those so that there was nothing about the associate relations or Workers' Comp. that impacted how he was being evaluated from a performance standpoint."

(Rec. Doc. 70-3 at 40). This is the only evidence Plaintiff brings to establish the causal link between his workers' compensation filing in June 2010 following his injury and his termination in September

2010. At best, this testimony shows that Baranek was aware that he had filed a workers' compensation claim, and that she wanted to ensure that he would not be evaluated unfavorably because of that filing. Without more, this testimony does not create a genuine issue of material fact that his workers' compensation filing had an impact on his performance evaluation, much less his termination.

Additionally, the Court finds as a matter of law that Plaintiff's transfers did not amount to a retaliatory action or adverse employment action. Plaintiff testified that his salary remained the same. (Rec. Doc. 70-2 at 18). The Gentilly store was smaller than the Lakeside store, but there is no evidence there were systematically less sales of tires or other equipment there than at the Lakeside store, or that the transfer was made with the knowledge that the Gentilly store would result in Plaintiff receiving fewer bonuses than he had at the Lakeside store. (Rec. Doc. 70-3 at 117). Plaintiff also admitted that the Gentilly store shortened his commute from his home in Arabi by ten to fifteen minutes. (Rec. Doc. 70-2 at 18). Further, the Airline store, the third and final store where Plaintiff worked, was a larger volume store than the Gentilly store, and Plaintiff admitted that he made more in bonuses there than he had at the Gentilly store. (Rec. Doc. 70-2 at 20). Plaintiff complains it was undesirable because it was "known as the drama queen store." (Rec. Doc. 62-2 at 14). Specifically, he testified that he did not like being at the Airline store because of "[t]he drama that went on with Rich Riccardi and Kirk Lee and Wayne Jackson, they are always fighting, you know, waiting any day for a fistfight to break out between them." (Rec. Doc. 70-2 at 38-39). Taken together, this evidence does not come close to showing that Plaintiff's transfers constituted adverse employment actions.

As for Plaintiff's termination, Goodyear, through its Human Resources representative, Patricia Cronin, has advanced a reason for terminating Plaintiff other than him filing a workers'

compensation claim: that he was witnessed sleeping while on duty on August 30, 2010, and a second time on September 6, 2010. (Rec. Doc. 62-3 at 7). Such action is grounds for immediate termination according to Goodyear policy. (Rec. Doc. 62-3 at 24).

The Court is unpersuaded that this reason is pretextual. Plaintiff's workers' compensation filing occurred over two months before he was terminated, and as stated earlier, he was permitted to schedule doctor's appointments related to his injury, with the exception of one, which he successfully rescheduled. These facts do not suggest that Goodyear was inclined to fire Plaintiff for filing a workers' compensation claim for his injury. Further, three employees witnessed Plaintiff sleeping during the first incident, and two witnessed him sleeping during the second incident. (Rec. Doc. 62-3 at 10-14). Plaintiff denies that he was sleeping during the first incident. (Rec. Doc. 70-2 at 44). However, three employees' words against his, without testimony by each employee or other evidence as to why they would lie about Plaintiff sleeping, strongly suggests that Plaintiff was indeed sleeping. Plaintiff admits that he was sleeping during the second incident, but claims he had clocked out by that time. (Rec. Doc. 62-2 at 20). Yet both witnesses that day independently stated that he was sleeping around 3:30, and Plaintiff's time sheet indicates that he clocked out at 4:11 p.m. (Rec. Doc. 62-3 at 11, 13; Rec. Doc. 70-3 at 87). This suggests that Plaintiff was sleeping before he clocked out. Moreover, it is unclear why Plaintiff would sleep after he had clocked out, instead of going home and sleeping there. Importantly, it is not this Court's place to second-guess an employer's reasonable business decision. *See Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1027. Plaintiff has not alleged, much less convinced the Court, that Goodyear's policy of immediate termination for sleeping on duty, or Goodyear's policy of relying on employee-witness statements as evidence of workplace violations, are unreasonable. For these reasons, the Court finds that Plaintiff's workers' compensation claim is

invalid as a matter of law.

### 6. Claim for Retaliation on the Basis of Opposition to Discriminatory Practices

Louisiana's whistleblower statute provides, in pertinent part:

An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law: (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law. (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law. (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. Rev. Stat. § 23:967A. Courts have held that the plaintiff must prove that a violation of law actually occurred. *Accardo v. Louisiana Health Services & Indem. Co.*, 943 So. 2d 381, 387 (La. App. 1 Cir. 2006) ("[W]e are compelled to conclude that the Louisiana Whistleblower Statute, La. Rev. Stat. 23:967, requires an employee to prove an actual violation of state law in order to prevail on the merits of the case."); *Jordan v. Jewel Marine, Inc.*, 2011 WL 2077795, *2-*3 (E.D. La. 2011). To survive summary judgment on a § 23:967 claim, the plaintiff must show that:

(1) his employer violated the law through a prohibited workplace act or practice; (2) he advised his employer of the violation; (3) he then refused to participate in the prohibited practice or threatened to disclose the practice; and (4) he was fired as a result of his refusal to participate in the unlawful practice or threat to disclose the practice.

*Jordan*, 2011 WL 2077795, *3 (citing *Diaz v. Superior Energy Services, LLC*, 2008 WL 3077071, *8 (E.D. La. 2008), *aff'd by Diaz v. Superior Energy Services, LLC*, 341 Fed. Appx. 26 (5th Cir. 2009).

Here, as described in sections 1.-5., Plaintiff fails to make a *prima facie* case that Goodyear violated any federal or state employment discrimination law. Specifically, Plaintiff has not met his burden of showing that Goodyear discriminating against him on the basis of his race, national origin, disability, filing of an FMLA claim, or filing of a workers' compensation claim. Therefore, he cannot prove that he was retaliated against for reporting any of these alleged discriminatory

practices. Plaintiff states, in his Surreply in Further Opposition to Motion for Summary Judgment, that § 23:967 does not require that Plaintiff show a "legal analysis" of the statutes he claims were violated, and that Defendants' attempt to obtain summary judgment on this "technicality" should be ignored. (Rec. Doc. 91 at 2). However, Plaintiff points to no authority contradicting the case law cited above, and the Court finds none. In addition, for the reasons stated in section 5., the Court is persuaded that Goodyear advanced a legitimate reason for terminating Plaintiff and that Plaintiff has failed to demonstrate that this reason was pretextual. Therefore, Goodyear is entitled to summary judgment on Plaintiff's whistleblower claim for reporting Goodyear's alleged discriminatory practices.

### 7. Claim for Retaliation on the Basis of Opposition to Violations of Other State Laws

Plaintiff's claim under Louisiana's whistleblower statute also fails with respect to his allegation that he was retaliated against for reporting alleged theft and/or fraud by Goodyear employees. In January 2010, Plaintiff reported to District Manager Guttuso that he believed that two Lakeside store employees were charging customers for coolant flushes when in fact they were performing an equivalent, but less expensive, procedure called "drain and fills." (Rec. Doc. 62-2 at 15-16). Guttuso did not perform a formal investigation of these allegations, but the targeted employees were written up for not using the flush machine. (Rec. Doc. 70-2 at 108-109). Guttuso testified that those employees later explained that they were performing "drain and fills" because the flush machine was not functioning properly. (Rec. Doc. 62-3 at 21). Plaintiff reported these same allegations to a hotline in April 2010, when he was no longer working at the Lakeside store. (Rec. Doc. 62-2 at 15-16).

Even assuming that Plaintiff was reporting an actual violation of state law, his claim under

La. Rev. Stat. § 23:967 fails. For the reasons stated in section 5., the Court is persuaded that Plaintiff's transfers did not constitute retaliatory action. Furthermore, Goodyear advanced a legitimate reason for terminating Plaintiff and that Plaintiff has failed to demonstrate that this reason was pretextual. In addition to those reasons, Riccardi, Plaintiff's supervisor who initiated Plaintiff's termination by informing the Human Resources department that he had been caught sleeping twice, testified in his deposition that he had no prior knowledge of Plaintiff's complaints regarding the alleged theft and/or fraud. (Rec. Doc. 62-3 at 31-32). Plaintiff offers no evidence that Riccardi was aware of Plaintiff's complaints related to those allegations. Finally, Plaintiff was terminated at least five months after his alleged complaints. This evidence further convinces the Court that there is no causal link between Plaintiff's environmental law violation complaints and his termination. Because the Court has found that his transfers did not amount to a retaliatory action or adverse employment action, it is irrelevant whether a causal link existed between Plaintiff's environmental law violation complaint and his transfers. Accordingly, Plaintiff's claim under La. Rev. Stat. §§ 23:967 cannot survive summary judgment.

### 8. Claim for Retaliation on the Basis of Opposition to State Environmental Laws Violations

Louisiana's environmental whistleblower statute states:

No firm, business, private or public corporation... shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following: (1) Discloses or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.

La. Rev. Stat. § 30:2027. To establish a claim under this statute, the plaintiff must prove that the termination or adverse employment action was caused by the plaintiff's reporting of the violation. *See Bear v. Pellerin Const., Inc.*, 806 So. 2d 984, 989 (La. App. 4 Cir. 2002).

Here, Plaintiff testified in his deposition that he witnessed Goodyear employees washing oil onto the street. (Rec. Doc. 70-2 at 13). Plaintiff asserts that he had a good faith belief that this action violated La. Rev. Stat. § 30:2276, which states:

> The court shall find the defendant liable to the state for the costs of remedial action taken because of an actual or potential discharge or disposal which may present an imminent and substantial endangerment to health or the environment at a pollution source or facility, if the court finds that the defendant performed any of the following: ... (3) Was the disposer who disposed of or discharged a hazardous substance or hazardous waste at the pollution source or facility....

La. Rev. Stat. § 30:2276. It is unclear whether he reported this specific alleged violation during his January 2010 call to David Guttuso, in which he complained that he was subject to race and national origin discrimination, and that some mechanics were overcharging customers for "drain and fill" procedures.

However, assuming that he had a good faith belief that the disposal of oil was an environmental law violation, and assuming that he reported this to Goodyear, his claim under La. Rev. Stat. § 30:2027 fails for the same reasons as those in section 7 above.

### 9. Unpaid Wages Claim

Plaintiff claims that Goodyear failed to timely pay (1) his wages for work between September 10, 2010 through September 14, 2014; (2) his final bonus check; and (3) his accrued vacation time. The Louisiana Wage Payment Statute states:

> A. (1)(a) Upon discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first....

> (2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment *may* be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed

with the employee's or laborer's current address as shown in the employer's records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official documentation from the United States Postal Service.

La. Rev. Stat. § 23:631 (emphasis added).

Plaintiff first claims that he is owed wages for the period between September 10, 2010, when he was sent home pending review of the claim that he had been sleeping on duty on August 30 and September 6. Under Goodyear's policy, when an employee is sent home pending review and is ultimately terminated, the employee's termination date is the date the employee was sent home, not the date the employee was notified that he was terminated. According to Human Resources representative Patricia Cronin, an employee who is sent home pending review but returns to work is entitled to wages for any days he was scheduled to work but did not because of the suspension. (Rec. Doc. 70-2 at 61).

Here, Plaintiff admits that he did not work from September 10 through September 14. (Rec. Doc. 62-2 at 30). He claims that Riccardi, his supervisor, told him to "use his vacation days until you come back," further suggesting that Plaintiff was not necessarily entitled to his regular salary during the suspension. (Rec. Doc. 70-2 at 41). Plaintiff claims that the policy is unlawful because it pays wages to a retained employee for days he missed because of the suspension, but it denies those wages to a terminated employee. However, the authority Plaintiff points to does not support this claim. Specifically, *Morris v. Parish Radio Service Co., Inc.*, does not contain the quotation Plaintiff cites (Rec. Doc. 70-2 at 9; Rec. Doc. 65-1 at 8), and deals with the timeliness of payments an employer owed to an employee, as well as whether the employee was entitled to wages for accrued vacation penalties for late payment, and attorney's fees. 444 So. 2d 163 (La. App. 1 Cir. 1983). The other case Plaintiff cites, *Lee v. Katz and Bestoff, Inc.*, held that an employment contract that caused unused *vacation pay* to be forfeited upon separation of employment was "manifestly

unjust." 479 So. 2d 459 (La. App. 1 Cir. 1985). The case in no way held that a policy like Goodyear's was unlawful. Plaintiff concedes that he was an at will employee, and nothing in his contract demonstrates that he was guaranteed wages from September 10 to September 14. Accordingly, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's claim for unpaid wages between those dates.

Next, Plaintiff claims Goodyear paid his final bonus check late, in violation of § 23:631. On September 15, Plaintiff was paid via direct deposit for wages earned between September 1 and September 15 instead of September 10 because the person cutting Plaintiff's paycheck did not know that he would be suspended and terminated at the time it was cut. As a result, Plaintiff was overpaid by $313.25. Goodyear deducted the overpayment from Plaintiff's final bonus check. At the time Plaintiff was terminated, employees were required to physically pick up their bonus checks at the store where they worked; unlike regular wages, they were not deposited directly into employees' accounts. (Rec. Doc. 62-3 at 27). Plaintiff does not contest that this was Goodyear's policy, or that Plaintiff's bonus check was ready for him to pick up on September 20, 2010, that is, ten days after he had been terminated. Instead, Plaintiff claims that Goodyear should have mailed the check to his home. Indeed, Plaintiff's September 30, 2010, letter demanding payment of his bonus check and unpaid wages for work from September 10 through September 14 requested that these payments be made via mail. (Rec. Doc. 70-2 at 2). However, Plaintiff cites no authority showing that he was entitled to have his bonus check or any other unpaid wages sent to him by mail. According to § 23:631, "[p]ayment shall be made at the place and in the manner which has been customary during the employment." Further, employers "may" mail final wages to former employees, but nothing in the statute indicates that they must, unless employees customarily receive their wages by mail. § 23:631. Therefore, Plaintiff's claim that his bonus check was untimely paid fails as a matter of law.

Finally, Plaintiff claims that his wages for accrued vacation days were untimely paid. The letter Plaintiff sent to Goodyear demanding unpaid wages did not specifically ask for wages for accrued vacation days; nor does the Complaint or the Amended Complaint. Plaintiff's Motion for Partial Summary Judgment, filed March 12, 2012, specifically demanded accrued vacation pay and associated late penalties in addition to his demand for unpaid wages and bonus. (Rec. Doc. 65-1 at 2). Goodyear has since agreed to pay Plaintiff for his 27 hours of accrued vacation time. It did so on March 22, 2012, ten days after Plaintiff filed his Motion for Partial Summary Judgment in which he demanded vacation pay for the first time. Goodyear also agreed to pay ten days' worth of penalty wages to account for the period between March 12 and March 22 during which it was researching the matter. (Rec. Doc. 87-1).

Plaintiff does not dispute that Goodyear paid him the correct amount in unpaid vacation wages on March 22. He claims, instead, that he is owed penalty wages and attorney's fees under La. Rev. Stat. § 23:632 for Goodyear's failure to timely pay those unused vacation hours. La. Rev. Stat. § 23:632 is a penal statute that must be strictly construed. *Glover v. Diving Services Intern., Inc.*, 577 So. 2d 1103, 1108 (La. App. 1 Cir. 1991). Penalty wages and attorney's fees are available if an employer "acted in bad faith or in an arbitrary or unreasonable manner []" in failing to comply with La. Rev. Stat. § 23:631. *Brown v. Navarre Chevrolet, Inc.*, 610 So. 2d 165, 171 (La. App. 3d 1992). Penalty wages are not appropriate "where the amount owed the employee is the subject of a *bona fide* dispute[]." *Brown*, 610 So. 2d 165, 171.

Here, Plaintiff has not put forth facts in its Motion for Partial Summary Judgment showing that Goodyear declined to pay his vacation hours in bad faith. Goodyear contends that it in good faith believed that Plaintiff's demand for a bonus check, as well as wages for the days between September 10 and September 14, did not constitute a demand for accrued vacation days as well.

Given that this Court has found that Plaintiff was not owed wages between September 10 and September 14, it is not unreasonable to conclude that the issue whether vacation hours also had to be paid was a matter of *bona fide* dispute. Whether or not an employer acted in "bad faith" or not is a question of fact for the jury. *Saacks v. Mohawk Carpet Corp.*, 855 So 2d. 359, 370 (La. App. 4 Cir. 2003). Accordingly, both Goodyear's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment concerning whether Plaintiff is owed additional penalty wages in connection with his accrued vacation wages are denied.

**B. Motion to Unseal Documents by Plaintiff**

Plaintiff argues that the Performance Improvement Plans of two Goodyear employees (Rec. Docs. 70-2 at 108-109), which were sealed pursuant to a Protective Order issued by Magistrate Judge Wilkinson, should be unsealed because they are not covered by the Protective Order. (Rec. Doc. 56). The Protective Order protects the following items:

> ... all tangible items and information produced by defendant during discovery and pretrial proceedings in this matter, including designated deposition testimony, which defendant in good faith asserts contain confidential and/or proprietary information related to (a) defendant's business operations and/or practices, or (b) personal information concerning its former and/or current employees or other non-parties to this lawsuit, including their employment, medical and financial information and personal data identifiers of the type contemplated by Fed. R. Civ. P. 5.2....

(Rec. Doc. 37 at 1).

The documents at issue are exactly of the type contemplated by the Protective Order. They concern the performance of two Goodyear employees or former employees in their employment at Goodyear. Plaintiff argues that it is prejudiced by the sealing because the documents are evidence of alleged fraud by the employees, and that concealing them from the public hinders his ability to fully litigate his claim that he was discriminated against and terminated for reporting the alleged

fraud.  (Rec. Doc. 56-1 at 20).  The Court is unpersuaded.  It is unclear how, at this stage in the litigation, the public's knowledge of the information in these documents would aid Plaintiff's case in any way.  However, the Court agrees that only those portions of filings that contain sensitive information as defined by the Protective Order should be sealed.  Therefore, the Court hereby orders that Plaintiff re-file redacted versions of his Motion for Partial Summary Judgment (Rec. Doc. 65) and his Opposition to Goodyear's Motion for Summary Judgment (Rec. Doc. 70) consistent with this Order.  Specifically, the Performance Improvement Plans shall remained sealed, and any content addressing those documents shall be redacted in accordance with the Protective Order.  Plaintiff's Motion to Unseal Documents (Rec. Doc. 56) and Defendant's Opposition to Plaintiff's Motion to Unseal Documents (Rec. Doc. 60) shall remain sealed in their entirety.

### C. Motion to Strike by Goodyear

#### 1. Strike Exhibits

Goodyear argues that the Court should strike all of the exhibits attached to Plaintiff's Opposition to Goodyear's Motion for Summary Judgment on the ground that it was not served with those exhibits.  Even if Plaintiff failed to properly serve Goodyear with its exhibits, the issue is now moot because Goodyear eventually accessed them, as evidenced by its citation to Plaintiff's exhibits in its Reply to Plaintiff's Opposition to Goodyear's Motion for Summary Judgment.  (Rec. Doc. 87 at 9, note 42).  Therefore, the Motion is denied as to this issue.

#### 2. Strike Plaintiff's Statement of Disputed Facts

Goodyear asks the Court to strike paragraphs 1-11 of Plaintiff's statement of disputed facts in its Opposition to Goodyear's Motion for Summary Judgment because it fails to comply with

Federal Rule of Civil Procedure 56(c), which states:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or
> (B) showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). The Court finds that Plaintiff's Opposition to Goodyear's Motion for Summary Judgment is appropriately cited to, and the above rule does not state that it specifically covers the statements of contested facts attached to oppositions to motions for summary judgment. Accordingly, Goodyear's Motion to strike is denied as to this issue as well.

### D. Motion *In Limine* to Exclude the Expert Report and Trial Testimony of Courtland M. Chaney

Plaintiff's expert Courtland M. Chaney was hired to provide testimony regarding "whether there is retaliation evidence against [Plaintiff]." (Rec. Doc. 61-2 at 25). The instant Order dismisses all of Plaintiff's retaliation claims. Accordingly, the court denies the Motion *In Limine* as moot.

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment is PARTIALLY GRANTED AND PARTIALLY DENIED. (Rec. Doc. 62). It is granted in all respects except for the issue whether Defendant owes Plaintiff penalty wages under La. Rev. Stat. § 23:631 for untimely payment of accrued vacation days.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is PARTIALLY GRANTED AND PARTIALLY DENIED. (Rec. Doc. 65). It is denied in all respects

except for the issue whether Defendant owes Plaintiff penalty wages under La. Rev. Stat. § 23:631 for untimely payment of accrued vacation days.

IT IS FURTHER ORDERED that Plaintiff's Motion to Unseal Documents is DENIED. (Rec. Doc. 56).

IT IS FURTHER ORDERED that Defendant's Motion to Strike is DENIED. (Rec. Doc. 73).

IT IS FURTHER ORDERED that Defendant's Motion *In Limine* to Exclude the Expert Report and Trial Testimony of Courtland M. Chaney is DENIED AS MOOT. (Rec. Doc. 61).

IT IS FURTHER ORDERED that Plaintiff RE-FILE AND REDACT its Motion for Partial Summary Judgment (Rec. Doc. 65) and its Opposition to Defendant's Motion for Summary Judgment (Rec. Doc. 70) consistent with this Order.

New Orleans, Louisiana, this 23rd day of April, 2012.

HELEN G. BERRIGAN
UNITED STATED DISTRICT JUDGE